THE PEOPLE OF THE STATE OF NEW YORK ex rel. LEONARD PRICE, Appellant, v WARDEN OF NEW YORK CITY CORRECTIONAL INSTITUTION FOR MEN, Respondent.

First Department, June 5, 1975

*Joseph Alan Kaplan* of counsel *(William Gallagher,* attorney), for appellant.

*Mark D. Lefkowitz* of counsel *(L. Kevin Sheridan* with him on the brief; *W. Bernard Richland, Corporation Counsel),* for respondent.

*Per Curiam.* The relator was imprisoned at the New York City Correctional Institution for Men on Riker's Island on

August 29, 1974. He was initially housed with the general population of the prison; however, several weeks after arrival, the prison warden received an anonymous note stating that if the two homosexuals then housed with the general population were not removed, their lives would be in danger.

Relator and another were identified by a corrections captain as being homosexuals. A subsequent interview and investigation of relator's background by a deputy warden of the institution revealed that in 1972 and 1973 the relator had signed statements admitting to his homosexuality. In October, 1973, relator was characterized by the institutional psychiatrist as a male homosexual.

After the interview, relator was told that he was to be transferred to segregated homosexual housing. He refused and, after a hearing, was placed in punitive segregation for 10 days. He was then placed in administrative segregation which category is reserved for those inmates who, for various reasons, are not compatible with the general prison population.

The classification of inmates and consideration of their health, educational and security needs has been left to the prison administrative authorities. The courts cannot establish inflexible procedures universally applicable to every conceivable situation, which procedures would constitute compliance with due process (Cafeteria Workers v McElroy, 367 US 886, 895; Wolff v McDonnell, 418 US 539, 560).

In the case at bar, due process was substantially afforded to the relator. He was interviewed and his prior background was investigated. The warden dealt with an exigent situation, where the possibility of a fatality or similar violence was a reality to be dealt with on an immediate basis.

The administrative segregation to which relator was subsequently relegated was imposed only after a hearing before a three-man board.

The file introduced in evidence at the hearing includes reports which hint at the most blatant problems extant in our correctional facilities — a lack of adequate physical plants and sufficient personnel to effectuate the rehabilitation of prisoners, though rehabilitation is the stated goal of our correctional institutions (see, e.g., Correction Law, §§ 66, 136).

We do not quarrel with the sentiment expressed by our dissenting brother: that much can be done to improve the

present criminal justice system; however, given present conditions, we cannot say that relator was not fairly treated.

Accordingly, the judgment of the Supreme Court, Bronx County, entered December 20, 1974, dismissing the petition for a writ of habeas corpus, should be affirmed.

MURPHY, J. (dissenting). I disagree and vote to sustain the writ.

The simple question raised on this appeal is whether relator was denied rudimentary due process before being subjected to first punitive and then administrative segregation because of his refusal to transfer to homosexual housing. The more complex issue before us is whether respondent's General Order No. 33, segregating homosexuals from the inmate population at large is unconstitutional on its face, or under the circumstances of this case.

Appellant was confined at the New York City Correctional Institution for Men at Riker's Island under a judgment imposing concurrent one-year sentences following his conviction of two class A misdemeanors (petit larceny and attempted grand larceny in the third degree); and placed in Dormitory 8L (housing general prison population). Some five weeks after his arrival at the institution an anonymous note was sent to the warden advising him that if three homosexuals were not removed from that dormitory they would be killed.

The interdepartmental memorandum received in evidence below reveals that at approximately 9:15 A.M. on October 8, 1974, a corrections captain was instructed by the acting deputy warden to investigate the matter. The captain then asked the officer assigned to 8L "if he knew of any trouble brewing in the Dorm because of any homos" and was informed "that there were definitely two homos that [the officer] knew of, but [the officer] had not heard or seen any signs of trouble." Appellant was then identified by the officer as one of the two homosexuals.

This highly unprofessional classification was then confirmed by the captain (who is not alleged to possess any medical license) because appellant was noticeably "effeminate in [his] looks, speech and manner".

The deputy warden was promptly notified of the captain's "findings" and he then interviewed appellant and advised him that he was being transferred to Dorm 4-U—segregated homosexual housing. Appellant refused to be transferred and was

subjected to disciplinary action. Pursuant to such action, he was placed in punitive segregation for 10 days and then in administrative segregation.

At the hearing held below on relator's writ of habeas corpus, the deputy warden conceded that relator neither admitted nor denied being a homosexual during the critical interview; but claimed that his decision to transfer appellant was made after "an exhaustive and extensive research of the records" (which concededly reveal that on prior stays at Riker's Island appellant had voluntarily declared himself a homosexual and that he had been referred for psychiatric evaluation by a medical doctor as a "possible homosexual").

However, contrary to such assertion, the captain's memorandum, bearing the same date as the incident in issue, discloses that he "effected the transfer at 10 a.m.", or just 45 minutes after being notified of the receipt of the note. In any event, and irrespective of such prior admissions, appellant denied being a homosexual at the disciplinary hearing held the following day and on the hearing below. Nevertheless, the trial court dismissed the writ, relying on section 137 of the Correction Law.

Admittedly, appropriate measures must be taken for the safety, security and control of correctional facilities and nothing herein contained should be deemed an attempt to minimize the problems arising from overcrowding and lack of proper facilities at institutions such as Riker's Island. However, prisoners, like schoolchildren, do not shed all of their constitutional rights at the front door of their respective institutions.(Cf. *Tinker v Des Moines School Dist.,* 393 US 503; *Goss v Lopez,* 491 US 565); and they are "not wholly stripped of constitutional protections when * * * imprisoned for crime". *(Wolff v McDonnell,* 418 US 539, 555.)

Respondent's sole justification for the action taken against relator is predicated upon the claimed need for institutional and inmate security. While it cannot be gainsaid that precautions may often be required under certain exigencies necessitated by an institution's environment, it appears to me that enforced isolation should be imposed on the one making the threat, rather than on his suspected victim.

The deputy warden testified below that homosexuals were excluded from general population solely because "they are a detriment to the good order of the institution". His only basis for such conclusion was his own quarter century of service in

the prison system. However it should be significantly noted, in such connection, that judicial notice was taken by the court below of the fact that the State's correctional facilities do not segregate homosexuals; nor, apparently, do the Federal prisons *(Walker v McCune,* 363 F Supp 254). Accordingly, despite the seemingly enlightened decision of respondent to separate the homosexual inmates from heterosexual inmates on a voluntary basis, I see no legal justification for summarily compelling such segregation under the guise of "security", particularly when, as here, there is no admission of homosexuality.

Moreover, and in any event, upon the record before us, and given the significant differences testified to below in the conditions of confinement between those housed in general population and in the homosexual dormitory (which, in itself, is of questionable legality *[People ex rel. Ceschini v Warden,* 30 AD2d 649]), appellant was entitled to some form of due process before being deprived of any benefits or subjected to any form of segregation. *(Sostre v McGinnis,* 442 F2d 178, cert den 404 US 1049.) And in reaching such determination, I see no useful purpose in engaging in any attempted semantic distinction between rights and privileges, since it clearly appears that defendant was being "punished" for status rather than for any overt criminal act. (Cf. *Robinson v California,* 370 US 660.)

Certainly, at the very least, before being compelled to transfer to the homosexual dormitory (and then placed in punitive and administrative segregation for refusing to do so), appellant was entitled to written notice of the claim that he was a homosexual and an opportunity to be heard thereon (including the chance to explain his prior "admissions"). In short, "[c]lassification by label * * * may facilitate prison administration but it cannot be used as a substitute for due process." *(Newkirk v Butler,* 499 F2d 1214, 1217.)

In light of the foregoing, the writ should be sustained and relator returned to general population.

MARKEWICH, J. P., TILZER and LANE, JJ., concur in *Per Curiam* opinion; KUPFERMAN and MURPHY, JJ., dissent in an opinion by MURPHY, J.

Judgment, Supreme Court, Bronx County entered December 20, 1974, affirmed.